UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------- X
                                               :

| | |
|---|---|
| JULIA LOPEZ-MOTHERWAY, | :   **MEMORANDUM DECISION** |
| | :   **AND ORDER** |
| Plaintiff, | : |
| | :   2:20-cv-5652 (BMC) |
| - against - | : |
| | : |
| CITY OF LONG BEACH; MARK STARK; | : |
| JOSEPH WIEMANN; WALTER | : |
| MUNSTERMAN; BRIAN WELLS; LUCAS | : |
| DIKRANIS; and POLICE OFFICERS JOHN | : |
| AND JANE DOES 1-10, | : |
| | : |
| Defendants. | : |

-------------------------------------------------------- X

**COGAN**, District Judge.

Plaintiff Julia Lopez-Motherway alleges that the City of Long Beach and several of its police officers ("defendants") violated her constitutional rights during her arrest and ultimately unsuccessful prosecution. Plaintiff asserts a variety of claims under 42 U.S.C. § 1983 and New York law. Defendants' motion to dismiss is granted in part and denied in part. Although many of the claims are dismissed, plaintiff may pursue her § 1983 claims for excessive force, false arrest, malicious prosecution, and an unreasonable search and seizure in violation of the Fourth Amendment.

## BACKGROUND

Plaintiff alleges that on the night of July 14, 2018, she went to the Nassau County Medical Examiner's Office to identify her mother's body. She then received word of a break-in at her late mother's home. She called 911 and drove to her mother's house. The front door been "removed" and the house had been "ransacked." Peering through the door, plaintiff saw

her estranged sister Jennifer and one of her sister's friends rummaging through her mother's belongings.  When officers arrived on the scene, plaintiff informed them that she was the homeowner's daughter.  An officer told her to leave.  As plaintiff headed out the door, she heard a "commotion" and "screaming."  Officer Lucas Dikranis was leading her sister out of the house in handcuffs.

On the sidewalk, plaintiff began recording the events on her phone.  Officer Mark Stark approached her and inquired why she was there.  Plaintiff informed him who she was and why she called the police.  Later, plaintiff observed Officer Stark "standing idly" alongside Officer Joseph Wiemann.  Officer Stark began "flashing a flashlight in [p]laintiff's face in an up and down motion."  He approached plaintiff and told her to leave.  Plaintiff began walking backward, still recording on her phone.  Officer Stark followed and continued to shine the flashlight in plaintiff's eyes.

Suddenly, an officer "pulled [p]laintiff's right hand . . . and twisted [her] left arm up and around [her] back."  The officer then "attacked" plaintiff from behind and "slammed" her into the sidewalk.  Plaintiff screamed for help, but the officer told her to "shut up" or he would "break her shoulder."  The officer did not state that plaintiff was under arrest until plaintiff was in handcuffs.

Plaintiff does not know the officer's identity.  Instead, she alleges that the officer was "either Defendant Police Officer Mark Stark, Defendant Police Officer Joseph Wiemann, Police Officer John Doe, or Police Officer Jane Doe."  Plaintiff also alleges that, once she was handcuffed, she saw that Officer Stark was holding her phone.

The officers brought plaintiff back to the station.  They handcuffed her to a bench in a cell.  Plaintiff was "bleeding from her face, left arm, knees, legs, [and] toes."  She repeatedly

requested medical attention, only to be ignored.  After plaintiff waited "for what she perceived as hours," two paramedics arrived and provided medical care.

Later, plaintiff asked Officer Wells for her phone.  "That's what insurance is for," he responded.  Plaintiff vowed to "track [her] phone and find it."  Officer Stark then came to the cell and returned the phone.  Later that night, plaintiff would turn on the phone and discover that the video of her encounter had been deleted.  However, she eventually found it in the "Recently Deleted" folder.

After Officer Stark returned her phone, plaintiff observed Officer Wells speaking with Officer Dikranis.  Officer Wells said, "But I wasn't there."  According to plaintiff, Officer Dikranis had arrested plaintiff's sister, but neither he nor Officer Wells had witnessed plaintiff's arrest.  Nevertheless, Officer Dikranis "leaned over the shoulders" of Officer Wells and "coach[ed]" him "on what to write" in the police report.  Then, Officer Wells and Officer Walter Munsterman drafted and signed a misdemeanor information – purportedly based on "personal knowledge" and "personal observations" – charging plaintiff with disorderly conduct and resisting arrest.

Next, the officers told plaintiff that she would be seeing a judge.  They escorted her to another room in the station, where she met Officer Dikranis's father, Judge Frank Dikranis.  Plaintiff did not have an attorney present, nor did the officers give plaintiff an opportunity to obtain one.  Judge Dikranis stated, "$2,000 bail, $1,000 cash."  The officers escorted plaintiff back to her cell and told her that if she did not come up with $1,000, they would transfer her to the county jail.  Plaintiff contacted a friend, who posted bail on plaintiff's behalf.  Plaintiff left the station and went straight to the emergency room.

On July 16, plaintiff appeared in the City Court of Long Beach, again before Judge Dikranis. Plaintiff was assigned an attorney and charged with resisting arrest and disorderly conduct. Judge Dikranis stated, "Bail is one thousand over two thousand. I'll continue that unless anyone wishes to be heard." The prosecution dragged on for the next few months.

In July 2019, the City handed over the prosecution to the Nassau County District Attorney's Office. Plaintiff showed the video of the incident to a prosecutor, and the criminal charges "were dismissed entirely." Plaintiff does little to elaborate on the circumstances of the dismissal, adding only that, "[u]pon information and belief, the criminal court judge handling the case even acknowledged that [p]laintiff had been exonerated, as the charges against [her] were voluntarily dismissed."

Over a year-and-a-half later, on November 20, 2020, plaintiff commenced this action. In the Amended Complaint, plaintiff asserts numerous claims. First, under § 1983, plaintiff brings claims for (1) excessive force, (2) false arrest, (3) abuse of process, (4) malicious prosecution, (5) an unreasonable search and seizure in violation of the Fourth Amendment, (6) a denial of the right to counsel in violation of the Sixth Amendment, and (7) municipal liability under Monell v. Department of Social Services, 436 U.S. 658 (1978). Next, plaintiff brings claims under state law for (8) abuse of process and (9) malicious prosecution. With one exception, plaintiff has asserted every claim against every defendant.[1] Defendants argue that plaintiff has failed to state a claim. I will address each claim in turn.[2]

---

[1] The exception is the Sixth Amendment claim, which is against only the City of Long Beach.

[2] For clarity, I have restyled and rearranged plaintiff's claims. First, plaintiff asserted a single claim for "false arrest and malicious prosecution," but those are not the same claim, and I will address them separately. Second, plaintiff did not specify a cause of action for the claims under the Fourth and Sixth Amendments, so I will construe them as claims under § 1983. See, e.g., Brown v. City of New York, No. 18-cv-3287, 2020 WL 1819880, at *5 (S.D.N.Y. Apr. 9, 2020). Finally, I will not address the Monell claim in this order, as I determined at the premotion conference that it would be addressed at a different stage in this litigation.

**DISCUSSION**

I.    **The § 1983 Excessive Force Claims**

Defendants do not contest whether plaintiff has adequately alleged that a police officer used excessive force.  Instead, they take issue with plaintiff's failure to specify *which* officer did so.  Defendants zero in on the allegation that the officer was "either Defendant Police Officer Mark Stark, Defendant Police Officer Joseph Wiemann, Police Officer John Doe, or Police Officer Jane Doe."  According to defendants, this ambiguity renders the claim "entirely speculative."  Because plaintiff cannot specify which officer used excessive force, they continue, the entire claim must be dismissed.

Defendants overplay their hand.  Of course, "each Government official . . . is only liable for his or her own misconduct."  Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009).  For excessive force claims, a plaintiff must allege sufficient facts that each defendant "was personally involved in the use of the claimed excessive force."  Piper v. City of Elmira, 12 F. Supp. 3d 577, 596 (W.D.N.Y. 2014).  But a plaintiff "need not establish who, among a group of officers, directly participated in the attack and who failed to intervene."  Smith v. Sawyer, 435 F. Supp. 3d 417, 441 (N.D.N.Y. 2020) (quotation omitted) (collecting cases).  A plaintiff need only allege "that [the defendants] were present on the night in question and participated in [the plaintiff's] arrest."  Id. (quotation omitted).  And a plaintiff may plead in the alternative, even if the allegations are inconsistent.  See Rizk v. City of New York, 462 F. Supp. 3d 203, 226 (E.D.N.Y. 2020); see also Fed. R. Civ. P. 8(d)(2).

For Officers Stark and Wiemann, plaintiff has done just that.  The Amended Complaint sets forth specific facts to show that both officers were present during the use of excessive force, that one of the two used excessive force, and that the other failed to intervene.  That is alternative pleading, quite different than the unbounded speculation in the cases defendants cite.  Compare

5

Case v. City of New York, 233 F. Supp. 3d 372, 397 (S.D.N.Y. 2017) (dismissing claim where the plaintiff alleged that she "cannot rule out" that [the defendant] was the officer who stepped on her face or put her in cuffs"), with Smith, 435 F. Supp. 3d at 441–42 (denying the defendants' motion for summary judgment where the plaintiff specified which officers participated in the arrest but could not specify which officers used excessive force and which failed to intervene).

The claims can proceed against Officers Stark and Wiemann. Yet plaintiff has asserted these claims against *all* defendants, and the Amended Complaint does not state any facts indicating that the other officers used excessive force. As to the other individual defendants, the claims are dismissed.

## II.    The § 1983 False Arrest Claims

To state a claim for false arrest under § 1983, a plaintiff must allege (1) that the defendants intended to confine her, (2) that she was conscious of the confinement, (3) that she did not consent to the confinement, and (4) that the confinement was not otherwise privileged. See, e.g., Berg v. Kelly, 897 F.3d 99, 106 (2d Cir. 2018). Defendants do not dispute that plaintiff has adequately alleged these elements, but once again, they emphasize that plaintiff has not specified which officer arrested her. Instead, she alleges that "Defendant Police Officer Mark Stark, Defendant Police Officer Joseph Wiemann, Police Officer John Doe, or Police Officer Jane Doe placed [her] in handcuffs and under arrest." She further alleges that Officers Wells and Dikranis drafted a false incident report regarding the arrest.

To survive a motion to dismiss, a plaintiff must allege sufficient facts to support an inference that each defendant "was directly involved" in the arrest. Crosby v. New York State Off. for People with Developmental Disabilities, No. 14-cv-656, 2015 WL 5542517, at *4 (W.D.N.Y. Sept. 18, 2015). "An officer need not necessarily have directly seized and handcuffed an individual to be liable for false arrest; he may also take part in less direct ways."

Duncan v. City of New York, No. 11-cv-3901, 2016 WL 11263166, at *8 (E.D.N.Y. Sept. 29, 2016) (collecting cases), report and recommendation adopted as modified, 2017 WL 3105856 (E.D.N.Y. July 21, 2017).  For instance, courts have sustained false arrest claims against officers who did not participate in the arrest itself but who "filled out the arresting paperwork" that "included false statements about what the officers allegedly saw."  Marom v. City of New York, No. 15-cv-2017, 2016 WL 916424, at *16 (S.D.N.Y. March 7, 2016) (internal quotation marks omitted); see also Case, 233 F. Supp. 3d at 397 (sustaining a claim against an officer who allegedly "processed" the arrest).  Under these standards, plaintiff has stated a claim against Officers Stark, Wiemann, Wells, and Dikranis.[3]

## III.    The Abuse of Process Claims

The federal and state abuse of process claims are overlapping but not coextensive.  Under New York law, an abuse of process claim "lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse o[r] justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process."  Savino v. City of New York, 331 F.3d 63, 76 (2d Cir. 2003) (quotation omitted).  The same elements apply to a § 1983 claim, but the plaintiff must also show "the deprivation of a constitutional right."  Wagner v. Hyra, No. 1:19-cv-4, 2021 WL 475331, at *8 (N.D.N.Y. Feb. 10, 2021) (quotation omitted).

The only element at issue is the collateral objective – the "crux" of any abuse of process claim.  Id. at *12 (quotation omitted).  To establish a collateral objective, a plaintiff must prove

---

[3] In their motion to dismiss, defendants argue that Officer Munsterman was a supervisor who was entitled to rely on his fellow officers' representations and, as a result, is entitled to qualified immunity for this claim.  Plaintiff does not respond to this argument.  Because plaintiff "ha[s] not mounted a defense against the facially valid arguments for dismissal that were advanced by defendants in their opening brief," I will deem this claim abandoned.  Moore v. Keller, No. 5:16-cv-1230, 2020 WL 6384691, at *7 (N.D.N.Y. Oct. 29, 2020).  The false arrest claim against Officer Munsterman is therefore dismissed.

that the defendants "acted not merely with an improper motive, but to achieve an improper purpose." <u>Scott v. City of New York</u>, No. 16-cv-834, 2020 WL 208915, at *12 (E.D.N.Y. Jan. 14, 2020). "[I]t is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim that they aimed to achieve a collateral purpose *beyond or in addition to* his criminal prosecution." <u>Savino</u>, 331 F.3d at 77 (emphasis added). Examples of collateral objectives include "infliction of economic harm, extortion, blackmail or retribution." <u>Wagner</u>, 2021 WL 475331, at *12 (alteration adopted) (quotation omitted); <u>see also</u> <u>Hoffman v. Town of Southampton</u>, 893 F. Supp. 2d 438, 449–50 (E.D.N.Y. 2012) (surveying examples of collateral objectives), <u>aff'd</u>, 523 F. App'x 770 (2d Cir. 2013).

Plaintiff has failed to allege a collateral objective. She first alleges that defendants sought "to cover-up their wrongdoings" and "to ensure that [she] would be convicted and would not be able to pursue her rights in court for her false arrest." Plaintiff also alleges that defendants sought to "cripple [her] financially by forcing her into submitting to court[] fees/fines." But neither securing a conviction nor subjecting the defendant to criminal restitution obligations is an objective "beyond" a criminal prosecution. <u>See</u> <u>Savino</u>, 331 F.3d at 77. Courts have therefore rejected similar allegations. <u>See</u> <u>Scott</u>, 2020 WL 208915, at *12 (defendants allegedly pursued charges "to justify the significant beating they inflicted" on the plaintiff); <u>Raus v. Town of Southampton</u>, No. 13-cv-7056, 2015 WL 2378974, at *9 (E.D.N.Y. May 18, 2015) (defendants allegedly pursued charges to "force [the plaintiff] to pay a monetary fine" and to "suffer financially"), <u>aff'd</u>, 661 F. App'x 81 (2d Cir. 2016); <u>see also</u> <u>Hoffman</u>, 893 F. Supp. 2d at 449 (collecting cases to show that "the collateral objective requirement is not satisfied by actions taken in prosecuting a case, even if done with a vindictive or vicious motive in an effort to

prevail in the prosecution").[4]

Because plaintiff has not adequately alleged a collateral objective, the state-law and § 1983 abuse of process claims are dismissed.

## IV.    The Malicious Prosecution Claims

### A.    The § 1983 Claims

"A § 1983 claim for malicious prosecution essentially alleges a violation of the plaintiff's right under the Fourth Amendment to be free from unreasonable seizure." Lanning v. City of Glens Falls, 908 F.3d 19, 28 (2d Cir. 2018). It thus requires "a seizure or other perversion of proper legal procedures implicating the [plaintiff's] personal liberty and privacy interests." Washington v. Cnty. of Rockland, 373 F.3d 310, 316 (2d Cir. 2004) (quotation omitted). The plaintiff must also establish (1) "the commencement or continuation of a criminal proceeding against her"; (2) "the termination of the proceeding in her favor"; (3) "that there was no probable cause for the proceeding"; and (4) "that the proceeding was instituted with malice." Mitchell v. City of New York, 841 F.3d 72, 79 (2d Cir. 2016) (quotation omitted).

The sole issue here is whether the criminal proceedings terminated in plaintiff's favor. That issue "is measured in objective terms by examining the totality of the circumstances." Lanning, 908 F.3d at 28 (quotation omitted). "When a person has been arrested and indicted, . . . the government's failure to proceed does not necessarily imply a lack of reasonable grounds for the prosecution." Id. (alteration adopted) (quotation omitted). Rather, the plaintiff must point to "an affirmative indication that [he or she] is innocent of the offense charged." Id.

Here, plaintiff has not offered much detail regarding the circumstances of her case. She begins by alleging that she showed the video to a prosecutor and that the prosecutor promptly

---

[4] To the extent that a desire to inflict financial harm could constitute a collateral objective in this case, plaintiff's allegations are wholly conclusory.

dismissed the charges.  Standing alone, these allegations would not survive a motion to dismiss. As the Second Circuit has observed, "alleg[ing] that the charges against [a plaintiff] 'were dismissed' . . . without specifying how or on what grounds . . . is consistent with dismissal on any number of procedural or jurisdictional grounds, all of which fail to affirmatively indicate innocence." Id. But plaintiff adds one additional, though somewhat extraordinary allegation – that the judge "acknowledged that [she] had been exonerated." That allegation provides the affirmative indication of innocence that the Second Circuit requires.[5]

Defendants can overcome this conclusion only by venturing outside the bounds of the complaint.  They first point to plaintiff's examination under New York General Municipal Law § 50-h, a prerequisite to her state-law claims.  There, say defendants, plaintiff testified that the case was dismissed "in the interest of justice," which the Second Circuit has held "cannot provide the favorable termination required as the basis for a claim of malicious prosecution." Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992).

Yet the "the great weight of authority" holds "that courts generally may not consider 50-h examination transcripts [on a motion to dismiss], because they fall outside the four corners of the

---

[5] Curiously, in opposition to the motion to dismiss, plaintiff has attached a one-page transcript of the dismissal.  It states that the case was dismissed under New York Criminal Procedure Law § 170.30(1), and it shows that the judge stated that "[b]ail is exonerated."  I will not consider this document at this stage.  To start, the complaint does not incorporate it by reference, nor is the document integral to the complaint – it anything, it somewhat contradicts an allegation in the complaint, and the task at this stage is not to resolve factual disputes.  See Glob. Network Comm'ns, Inc. v. City of New York, 458 F.3d 150, 156 (2d Cir. 2006).  Nor can I take judicial notice of this transcript.  On a motion to dismiss, "[a] court may take judicial notice of a document filed in another court not for the truth of the matters asserted in the other litigation, but rather to establish the fact of such litigation and related filings." Id. (quotation omitted).  Finally, the transcript mentions that the case was dismissed under New York Criminal Procedure Law § 170.30(1).  That statute provides various grounds upon which a criminal defendant may move to dismiss "a simplified information, a prosecutor's information or a misdemeanor complaint."  N.Y. Crim. Proc. Law § 170.30(1)(a)–(g).  When addressing this provision, other courts have observed that, "[a]lthough the 'favorable termination' prong of a malicious prosecution claim ordinarily presents a question of law, this issue must be resolved by a jury if there are questions of fact regarding the basis for dismissal of the prosecution." Genovese v. Cnty. of Suffolk, 128 F. Supp. 3d 661, 672 (E.D.N.Y. 2015).  Here, "the transcript of the proceeding does not conclusively resolve the issue," so it cannot provide the basis for dismissal. Id. at 673.

complaint." Gurrieri v. Cnty. of Nassau, No. 2:16-cv-6983, 2018 WL 6590564, at *5 (E.D.N.Y. Dec. 14, 2018) (collecting cases).

Even if I could take judicial notice of the nature of the dismissal, the Second Circuit's holding is not as broad as defendants claim. True, in Hygh v. Jacobs, 961 F.2d 359, 368 (2d Cir. 1992), the Second Circuit stated that a dismissal "in the interest of justice" did not provide a favorable termination as a matter of law. This was so because it "le[ft] the question of guilt or innocence unanswered," offering "neither an acquittal of the charges nor any determination of the merits." Id. (quoting Ryan v. New York Tel. Co., 62 N.Y.2d 494, 504–05, 478 N.Y.S.2d 823, 829 (1984)). In later cases, however, the Circuit clarified that it held only that a dismissal in the interest of justice "is *by itself* insufficient to satisfy the favorable termination requirement as a matter of law." Thompson v. Clark, 794 F. App'x 140, 141 (2d Cir. 2020) (emphasis added) (discussing Hygh).

Further, in Lanning v. City of Glens Falls, 908 F.3d 19, 28 (2d Cir. 2018), the Circuit reaffirmed its more general, totality-of-the-circumstances standard, not the sort of bright-line rule that defendants claim. Thus, a dismissal in the interest of justice "cannot provide the favorable termination" when it "leaves the question of guilt or innocence unanswered." Id. at 28–29 (alterations adopted) (quoting Hygh, 961 F.2d at 367–68). Yet the Circuit has suggested that a dismissal in the interest of justice *can* provide a favorable termination where either the prosecution or the court "provide[s] any specific reasons about the dismissal on the record." Thompson, 794 F. App'x at 141. Here, plaintiff alleges that the court stated that she had been "exonerated." In these unique circumstances, the claim survives the motion to dismiss.[6]

---

[6] To the extent Lanning injected some uncertainty into this issue, we will soon get clarification. In Thompson v. Clark, the Supreme Court granted certiorari to decide the standard for the favorable termination requirement. See 794 F. App'x 140 (2d Cir. 2020), cert. granted, 2021 WL 850622 (U.S. March 8, 2021) (No. 20-659). There is currently a circuit split. Although the Second Circuit requires the plaintiff to demonstrate that the proceeding

Still, the claim does not survive against all defendants.  Only Officers Wells, Dikranis, and Munsterman participated in the events giving rise to this claim.  As to the other individual defendants, the claim is dismissed.

**B.      The State-Law Claims**

For the state-law malicious prosecution claim, defendants cannot rely on the dismissal in the interest of justice.  See Cantalino v. Danner, 96 N.Y.2d 391, 395–97, 729 N.Y.S.2d 405, 408–09 (2001).  Instead, they argue that the claim is time-barred.  The limitations period is one year and ninety days.  See N.Y. Gen. Mun. Law § 50-i; Murphy v. City of Rochester, 986 F. Supp. 2d 257, 265 (W.D.N.Y. 2013).  The cause of action accrues on the date that the proceeding terminates in favor of the plaintiff – in this case, upon dismissal of the charges.  See Mejia v. City of New York, 119 F. Supp. 2d 232, 278 (E.D.N.Y. 2000) (citing Scomello v. Caronia, 232 A.D.2d 625, 625, 648 N.Y.S.2d 688, 689 (2d Dep't 1996)).  Plaintiff alleges that the charges were dismissed "[i]n July 2019."  Thus, the latest this cause of action could have accrued is July 31, 2019, in which case the limitations period would have expired on October 29, 2020 – nearly a month before plaintiff commenced this case.  In most circumstances, the analysis would end there.

But these are not normal circumstances.  In the middle of the limitations period, the COVID-19 pandemic struck.  The governor issued Executive Order 202.8, purporting to "toll" the statute of limitations:

> NOW, THEREFORE, I, Andrew M. Cuomo, Governor of the State of New York, by virtue of the authority vested in me by Section 29-a of Article 2-B of the Executive Law to temporarily suspend or modify any statute, local law, ordinance, order, rule, or regulation, or parts thereof, of any agency during a State disaster emergency, if compliance with such statute, local law, ordinance, order,

---

"ended in a manner that affirmatively indicates his innocence," Lanning, 908 F.3d at 22, the Eleventh Circuit requires only that the plaintiff show that the proceeding "formally ended in a manner not inconsistent with his innocence," Laskar v. Hurd, 972 F.3d 1278, 1293 (11th Cir. 2020).

rule, or regulation would prevent, hinder, or delay action necessary to cope with the disaster emergency or if necessary to assist or aid in coping with such disaster, I hereby temporarily suspend or modify, for the period from the date of this Executive Order through April 19, 2020 the following:

In accordance with the directive of the Chief Judge of the State to limit court operations to essential matters during the pendency of the COVID-19 health crisis, any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding, as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any other statute, local law, ordinance, order, rule, or regulation, or part thereof, *is hereby tolled* from the date of this executive order until April 19, 2020.

Exec. Order No. 202.8 (March 7, 2020) (emphasis added).  The governor extended the deadline in a series of subsequent executive orders.  See Exec. Order No. 202.38 (June 6, 2020); Exec. Order No. 202.48 (July 6, 2020); Exec. Order No. 202.55 (Aug. 5, 2020); Exec. Order No. 202.55.1 (Aug. 6, 2020); Exec. Order No. 202.60 (Sept. 4, 2020).  In the last installment, the governor set a final deadline of November 3:

The suspension in Executive Order 202.8, as modified and extended in subsequent Executive Orders, that tolled any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding as prescribed by the procedural laws of the state, including but not limited to the criminal procedure law, the family court act, the civil practice law and rules, the court of claims act, the surrogate's court procedure act, and the uniform court acts, or by any statute, local law, ordinance, order, rule, or regulation, or part thereof, is hereby continued, as modified by prior executive orders, provided however, for any civil case, such suspension is only effective until November 3, 2020, and after such date any such time limit will no longer be tolled.

Exec. Order No. 202.67 (Oct. 4, 2020).  Despite this warning, plaintiff waited another two weeks – until November 20, 2020 – to commence this action.

The question, then, is whether these executive orders "tolled" or "suspended" the statute of limitations.  A "toll" means that the limitations period "stops running," only to "start[] running again when the tolling period ends, picking up where it left off."  Artis v. District of Columbia,

13

138 S. Ct. 594, 601 (2018); accord Bermudez Chavez v. Occidental Chem. Corp., 35 N.Y.3d 492, 505 n.8, 132 N.Y.S.3d 224, 233 n.8 (2020).  In contrast, the parties argue, a "suspension" "simply extends the expiration date of the limitations period to a later defined date on the calendar[,] . . . without re-starting the statute of limitations clock at the end of that period."  Mark C. Dillon, An Overview of Tolls of Statutes of Limitations on Account of War: Are They Current and Relevant in the Post-September 11th Era?, 13 N.Y.U. J. Legis. & Pub. Pol'y 315, 354 (2010) (citing Randolph v. CIBC World Mkts., 219 F. Supp.2d 399, 402 (S.D.N.Y. 2002); Scheja v. Sosa, 4 A.D.3d 410, 410, 771 N.Y.S.2d 554, 555 (2d Dep't 2004)).[7]

 This distinction determines the timeliness of plaintiff's claims.  If the executive order stopped the clock from running, plaintiff had spare time when it restarted on November 3.  But if the executive order merely stopped the clock from buzzing, the time to file expired on November 3.  Thus, the parties argue, I must decide two issues: (1) whether Executive Order 202.8 imposes a toll rather than a suspension and, if so, (2) whether the governor had the power to toll the statute of limitations.

 The first issue is more straightforward than the second.  "As is true of interpretation of statutes, the interpretation of an Executive Order begins with its text."  Singh v. Gantner, 503 F. Supp. 2d 592, 596 (E.D.N.Y. 2007) (quotation omitted).  The plain text of Executive Order 202.8 states that the statute of limitations "is hereby tolled."  That language differs from past executive

---

[7] As other courts have noted, the semantic distinction between a "toll" and a "suspension" may not be quite as clean as some commentators seem to believe.  See Bonilla v. City of New York, No. 20-cv-1704, 2020 WL 6686531, at *2 n.2 (E.D.N.Y. Oct. 3, 2020) (noting the "ambiguity" and citing a law review article for the definition of "suspension"), aff'd, 2020 WL 6637214 (E.D.N.Y. Nov. 12, 2020).  In fact, both the Supreme Court of the United States and the New York Court of Appeals have described "tolls" as a form of "suspension."  See Artis, 138 S. Ct. at 601 (stating that "'tolled' . . . means that the limitations period is suspended"); Bermudez, 35 N.Y.3d at 505 n.8, 132 N.Y.S.3d at 233 n.8 (stating that a toll "does not extend the statute of limitations indefinitely but merely suspends the running of the applicable statute of limitations"); see also Chardon v. Fumero Soto, 462 U.S. 650, 652 n.1 (1983) (describing different "[t]olling effect[s]"); Hunter-Boykin v. George Washington Univ., 132 F.3d 77, 83 (D.C. Cir. 1998) ("Other courts, too numerous to list, also have interpreted the word 'toll' as meaning 'suspend' or its equivalent.").  Because this case does not present the issue, I will assume that the parties' terminology is correct.

orders, which "temporarily suspend[ed]" the statute of limitations.  Exec. Order No. 52 (Oct. 31, 2012) (addressing Hurricane Sandy).  By using "tolled," Executive Order 202.8 says what it means and means what it says.  Cf. Dziennik v. Sealift, Inc., No. 04-cv-1244, 2018 WL 1725623, at *2 (E.D.N.Y. March 30, 2018) (applying this presumption to a statute).

It is far less clear that the governor had the power to toll the statute of limitations.  The governor issued Executive Order 202.8 under New York Executive Law § 29-a.  That statute gives the governor two important powers.  First, it authorizes the governor to "temporarily suspend any statute . . . if compliance with such provisions would prevent, hinder, or delay action necessary to cope with the disaster or if necessary to assist or aid in coping with such disaster."  N.Y. Exec. Law § 29-a(1).  Second, it allows "[t]he governor, by executive order, [to] issue any directive during a state disaster emergency declared in . . . [a] disease outbreak . . . necessary to cope with the disaster."  Id.; see also Melendez v. City of New York, No. 20-cv-5301, 2020 WL 7705633, at *2 (S.D.N.Y. Nov. 25, 2020) (noting that this second provision "expanded the Governor's existing authority" to "temporarily suspend" a statute).  According to plaintiff, this second provision allowed the governor to toll the statute of limitations.  Defendants focus on the first provision, contending that it limited the governor to suspensions.

I need not resolve this conflict.  The claim arrives by way of supplemental jurisdiction, and a district court "may decline to exercise supplemental jurisdiction" if a claim "raises a novel or complex issue of State law."  28 U.S.C. § 1367(c)(1).  "[P]rinciples of federalism and comity may dictate that these questions be left for decision by the state courts" – and that is "especially" true "where those questions concern the state's interest in the administration of its government."  Valencia ex rel. Franco v. Lee, 316 F.3d 299, 306 (2d Cir. 2003) (quoting Seabrook v. Jacobson, 153 F.3d 70, 72 (2d Cir. 1998)).  These questions loom especially large during the pandemic.

Courts around the country have faced claims that turned on the authority of a state's governor and the separation of powers within a state government, and in these circumstances, they have often declined to exercise supplemental jurisdiction. See Cassell v. Snyders, No. 20-1757, 2021 WL 852227, at *10 (7th Cir. March 8, 2021); Bowman v. Ouachita Parish Sheriff's Office, No. 3:20-cv-01372, 2021 WL 899076 (W.D. La. March 9, 2021); cf. Berryman v. Sampson, No. 1:10-cv-12169, 2011 WL 6450775, at *8 (E.D. Mich. Sept. 8, 2011) (citing Valencia, 316 F.3d at 306) (declining supplemental jurisdiction over a claim that implicated the extent of a governor's "exclusive power with respect to pardons and commutations" under the state constitution), report and recommendation adopted, 2011 WL 6641126 (E.D. Mich. Dec. 21, 2011).

This case fits comfortably within that framework. The governor's executive orders have ferried his power into uncharted territory, bringing a wave of litigation. See, e.g., Agudath Israel of Am. v. Cuomo, 983 F.3d 620, 625 (2d Cir. 2020) (addressing a constitutional challenge to an executive order and noting that the New York Executive Law "allows [the governor] to exercise extraordinary executive powers"); Dao Yin v. Cuomo, 183 A.D.3d 926, 928, 125 N.Y.S.3d 123, 125 (2d Dep't 2020) (same). But while many of the executive orders have been highly litigated, this particular one has not. The parties have not cited a single case from the New York Court of Appeals or Appellate Divisions that addresses the governor's power to toll the statute of limitations. Instead, they cite dueling commentary.[8] That is too thin a reed to support a decision on this sensitive issue. See Berryman, 2011 WL 6450775, at *8 (declining supplemental jurisdiction where no cases addressed an issue). In the "exceptional circumstances of the

---

[8] Compare Thomas F. Whelan, Executive Orders: A Suspension, Not a Toll of the SOL, 264 N.Y.L.J. 4 at col. 4 (Oct. 7, 2020), with Adam Swanson & Stephanie Pisko, NY Court Deadline Extensions Bring Confusion For Litigants, Law360, Oct. 29, 2020, available at https://www.law360.com/articles/1324021/ny-court-deadline-extensions-bring-confusion-for-litigants.

pandemic," federal courts have good reason "to think twice before wading into important and difficult state-law issues that the state's own courts have yet to explore." <u>Cassell</u>, 2021 WL 852227, at \*10.  Therefore, I decline to exercise supplemental jurisdiction over the state-law claim for malicious prosecution.  To the extent this decision may result in duplicative litigation, that is the price of comity in our federal system.[9]

## V.    The § 1983 Fourth Amendment Claims

Plaintiff also alleges that defendants violated the Fourth Amendment by seizing and searching her phone.  She alleges that officers took her phone, searched for the video that documented their use of excessive force, and then deleted it.  Defendants maintain that none of these actions violated the Fourth Amendment.  Citing cases decided well before the invention of cell phones, they argue that a phone is merely a "container" or "article" that police may always search incident to arrest.

The argument is without merit.  <u>See</u> <u>Riley v. California</u>, 573 U.S. 373, 403 (2014) (unanimously holding that police generally may not, without a warrant, search a cell phone seized incident to arrest).  Indeed, courts have rejected nearly identical arguments as advancing an "awesome breadth of government power that no court, to [their] knowledge, has come close to recognizing."  <u>Crocker v. Beatty</u>, 886 F.3d 1132, 1137 (11th Cir. 2018) (holding that an officer violated the Fourth Amendment by seizing the plaintiff's phone); <u>see also</u> <u>Hupp v. Cook</u>, 931 F.3d 307, 329 (4th Cir. 2019) (holding that the warrantless seizure of a phone violated the Fourth Amendment and rejecting the defendants' argument as "find[ing] no support in our Fourth Amendment jurisprudence"); <u>Oquendo v. City of Boise</u>, No. 1:15-cv-322, 2017 WL

---

[9] Although one case has addressed the "toll vs. suspension" issue since the parties submitted briefing, <u>see</u> <u>Foy v. State</u>, No. 135085, 2021 WL 866035, at \*2 (N.Y. Ct. Cl. Feb. 16, 2021) (concluding that the governor could toll the statute of limitations), that lone case does not change my conclusion that this matter is best left for state courts.

874569, at *9 (D. Idaho March 3, 2017) (holding that a plaintiff adequately alleged a violation of the Fourth Amendment where an officer seized a phone and a deleted a video).

Nevertheless, plaintiff has once again asserted this claim against every defendant.  Only Officers Wells and Stark participated in the seizure and search of the phone.  The claims against all other individual defendants are dismissed.

## VI.   The § 1983 Sixth Amendment Claims

Finally, plaintiff alleges that the City violated her Sixth Amendment right to counsel when Judge Dikranis set bail in the police station.  Defendants argue that the City Court is not an arm of the City, but a component of the New York State Unified Court System.  Plaintiff offers no response.

When "a defendant moves to dismiss [a] claim and the plaintiff fails to address in their opposition papers defendants' arguments for dismissing such a claim," courts have discretion to dismiss the claim as abandoned.  Robinson v. Fischer, No. 09-cv-8882, 2010 WL 5376204, at *10 (S.D.N.Y. Dec. 29, 2010) (collecting cases).  Exercising that discretion is particularly appropriate here.  This claim raises complex and evolving issues of constitutional law.  See generally Booth v. Galveston Cnty., No. 3:18-cv-104, 2019 WL 3714455, at *9–17 (S.D. Tex. Aug. 7, 2019) (granting a preliminary injunction and discussing, at considerable length, how the Sixth Amendment right to counsel applies in initial bail hearings in county courts), report and recommendation adopted as modified, 2019 WL 4305457 (S.D. Tex. Sept. 11, 2019), appeal docketed, No. 19-40785 (5th Cir. Sept. 18, 2019).  Because plaintiff has failed to address these issues, the claims are dismissed as abandoned.

## CONCLUSION

Defendants' motion to dismiss [11] is granted in part and denied in part.  The following claims are dismissed with prejudice:

- The § 1983 excessive force claims against Officers Dikranis, Wells, and Munsterman;

- The § 1983 false arrest claim against Officer Munsterman;

- The § 1983 and state-law abuse of process claims against all defendants;

- The § 1983 malicious prosecution claims against Officers Stark and Wiemann;

- The § 1983 claims for violations of the Fourth Amendment against Officers Dikranis, Wells, and Munsterman; and

- The § 1983 claims for violations of the Sixth Amendment right to counsel against all defendants.

The state-law malicious prosecution claims are dismissed without prejudice to their pursuit in state court.  As to all other claims, the motion to dismiss is denied.

**SO ORDERED.**

Digitally signed by Brian M. Cogan

_____
U.S.D.J.

Dated: Brooklyn, New York
       March 15, 2021